**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| CAROLYN BAKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:05-CV-348-TS |
| | ) | |
| PHYSICIANS HEALTH PLAN | ) | |
| OF NORTHERN INDIANA GROUP HEALTH | ) | |
| PLAN, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION**

This case is before the Court on the parties' motions for summary judgment. The Plaintiff

claims the Defendant, as the administrator of her health plan, improperly denied her claim for

benefits under ERISA. The Defendant moved for summary judgment on March 20, 2006. The

Plaintiff filed its cross-motion for summary judgment on April 19, 2006, and responded to the

Defendant's motion on April 20, 2006. The Defendant responded to the Plaintiff's motion for

summary judgment on May 22, 2006, and replied to the Plaintiff's response on May 25, 2006.

The Plaintiff filed its reply on June 1, 2006.  The Court ordered additional briefing on April 16,

2007. The Defendant responded on May 14, 2007, and the Plaintiff replied on May 30, 2007.

For the reasons stated below, the Plaintiff's motion for summary judgment is granted, and

the Defendant's motion for summary judgment is denied.

**A.      Summary Judgment Standard**

The Federal Rules of Civil Procedure mandate that motions for summary judgment be

granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment must be given against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Federal Rule of Civil Procedure 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 248–50 (1986). Only material facts will preclude summary judgment; irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Anderson*, 477 U.S. at 248–49. If there is no genuine issue of material fact, the only question is whether the moving party is entitled to judgment as a matter of law. *Miranda v. Wisc. Power & Light Co.*, 91 F.3d 1011, 1014 (7th Cir. 1996).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992).

**B.      Material Facts**

The parties stipulated that the administrative record is the only evidence relevant to the suit.

The Defendant is a non-profit corporation that sponsors a group health plan subject to ERISA. The Plaintiff is an employee of the Defendant and participated in the group health plan.

*1.      The Plan*

The plan contains a section titled "Administrative and Fiduciary Responsibilities" that discusses the Defendant's discretion in administering the plan. In that section, the plan states as follows:

> PHP has sole and exclusive discretion to determine claims for benefits Covered under the Contract, including
>
> - making the initial claims decisions;
> - resolving appeals of those decisions pursuant to our Grievance Procedures; and
> - communicating those decisions to the affected Members
>
> We may, from time to time, delegate discretionary authority to other persons or entities providing services in regard to the Contract. To the extent the foregoing functions include fiduciary responsibilities under ERISA, PHP shall be the named fiduciary with respect to those functions.
>
> We reserve the right, in Our sole discretion, to: (1) change, modify, withdraw, or add benefits; and (2) to terminate the Contract, subject to its termination provisions. Prior notice to or approval by Members is not required.
>
> The fact that We may have interpreted a provision of the Contract in a way that provides benefits shall not prevent Us from later interpreting the same provision in a way that does not provide benefits, subject to compliance with ERISA and other applicable law. This paragraph applies only where the interpretation of this policy is governed by ERISA, 29 U.S.C. 1001 *et seq.*
>
> . . . .

We may, in certain circumstances, Cover Health Services that would not otherwise be Covered. This is at Our sole discretion and shall be done for purposes of overall cost savings or efficiency. The fact that We do so in any one case shall not in any way be deemed to require Us to do so in similar cases.

(R. 134–35.) The plan provides coverage only for procedures that are "medically necessary."

The plan defines the term "medically necessary" as follows:

**"Medically Necessary"** — Health Services that are determined by PHP to be **all** of the following:

(1)     medically appropriate and necessary to meet the Member's basic needs;

(2)     the most cost-effective method of treatment and rendered in the most cost-effective manner and type of setting appropriate for the delivery of the Health Service;

(3)     consistent in type, frequency and duration of treatment with relevant guidelines of national medical, research and health care coverage organizations and governmental agencies;

(4)     accepted by the medical community as consistent with the diagnosis and prescribed course of treatment and rendered at a frequency and duration considered by the medical community as medically appropriate;

(5)     required for reasons other than the comfort or convenience of the Member or his or her Doctor;

(6)     of a demonstrated medical value in treating the condition of the Member; and

(7)     consistent with patterns of care found in established managed care environments for treatment of the particular health condition.

The definition of "Medically Necessary" used in the Contract: (1) relates only to Coverage; and (2) may differ from the way a Doctor engaged in the practice of medicine defines "medically necessary."

The fact that a Doctor has performed or prescribed a Health Service does not mean that it is Medically Necessary. Nor does the fact that a particular Health Service may be the only option available for a particular condition mean that it is Medically Necessary. We retain the right to make all final determinations as to which Health Services are Medically Necessary, subject to the procedures specified in Article 5.

4

(R. 247–48.) The Plan does not cover "Cosmetic Procedures," which are defined as "procedures that improve physical appearance but do not correct or materially improve a physical function. Cosmetic Procedures include, but are not limited to, pharmacological regimes, plastic surgery, and nutritional procedures and treatments." (R. 242.)

**2.     *The Mammoplasty Guidelines and the Schnur Table***

The Plan Medical Policy Manual contains guidelines for determining whether a mammoplasty is medically necessary. There are several versions of the mammoplasty guidelines in the record. The parties agree that the guidelines that were applicable in 2003 start on page 173 of the record.

The 2003 guidelines state that mammoplasty is "considered a cosmetic procedure and therefore not a covered benefit unless medically necessary." (R. 173.) The guideline states that "cosmetic surgery, as defined by the Certificate of Coverage, is surgery performed primarily for cosmetic resons, with the intention to enhance or change physical appearance." (R. 173.) The Guideline states that mammoplasty is covered "when medically necessary with specific guidelines and case-by-case review." (R. 173.) To be approved for coverage, the "amount of tissue in grams estimated to be removed by the requesting surgeon must equal or exceed the amount indicated in the accompanying 'Reduction Mammoplasty Criteria' tables." (R. 173.) The Defendant's criteria tables take into account a patient's height and weight and from that, derive the amount of tissue that must be taken from each breast for the mammoplasty to be approved.

The criteria table was adopted from a 1991 article written by Paul Schnur and others. Paul Schnur et al., *Reduction Mammoplasty: Cosmetic or Reconstructive Procedure?*, 27 Ann.

5

Plast. Surg. 232 (1991); (R. 74). The article describes a survey of plastic surgeons regarding their patients who underwent reduction mammoplasty. The surgeons reported the body surface area of each patient (calculated from the patient's height and weight) and the amount of tissue removed during the mammoplasty surgery. Later, the same surgeons were asked to report the percentage of mammoplasty procedures they estimated were for purely symptomatic reasons, for purely cosmetic reasons, and for borderline symptoms, or mixed purposes. The surgeons reported that 78% of mammoplasties were done purely for symptomatic purposes, 17% for mixed purposes, and 5% purely for cosmetic purposes.

A graph was created from the collected patients' data by plotting the reported weight of tissue removed against the body surface area of the patient. One line was drawn on the graph so that the 5% of patients who had the least tissue removed were below the line. A second line was drawn so that the lowest 22% of patients were below that line, and 17% of patients were in between the two lines. The paper stated that the graph could be used to determine what a woman's motivation was in undergoing a reduction mammoplasty by the amount of tissue removed. If the patient has enough tissue removed to put her in the top 78% of patients, the paper suggests the patient's motivation is purely to relieve symptoms. If a patient is in the 17% between the two lines, the paper suggests the individual may have had mixed motives and recommends individual consideration of the patient's motives. If a patient is in the lowest 5%,



**Figure 1, R. 77.**

the paper suggests the patient is motivated solely by cosmetic concerns. The paper says nothing about the actual health benefits of mammoplasty or how much tissue must be removed to reduce symptoms.

### 3.     *The Preapproval of the Plaintiff's Mammoplasty*

The Plaintiff sought written approval from the Defendant in May 2002 for a reduction mammoplasty. The reason for the request, according to the Plaintiff, was that she experienced chronic back, neck and shoulder pain. (R. 23.) The Plaintiff weighed 220 pounds and was 5'6" tall. The Plaintiff's surgeon's notes indicate that he estimated that he would remove 800 grams from each breast. According to the criteria table adopted from the Schnur article, a woman

weighing 220 pounds between 5'6" and 5'8" tall, needs to have 750 grams of tissue or more removed from each breast for the mammoplasty to qualify as medically necessary. Because it was estimated that the Plaintiff would have over 750 grams of tissue removed from each breast, the Defendant authorized the procedure. The authorization noted that it was "not a guarantee of payment," (R. 27), and that "new information or changes in existing information" may result in a different decision, (R. 27).

The Plaintiff decided not to get mammoplasty in 2002. In May 2003, the Plaintiff again requested preapproval. The Plaintiff's surgeon again estimated that he would remove 800 grams of tissue from each breast. The Defendant authorized the procedure with the same qualifying language. The form also stated "Breast Reduction Authorized. Removal of 800 grams tissue from left & 800 grams from right meets PHP's Standard Criteria." (R. 35.) The form went on to state,

> This authorization is not a guarantee of payment. If less than the standard required tissue is removed PHP shall consider the services cosmetic, rather than medically necessary, resulting in services not covered by the benefit contract. The decision to pay for services rendered will result from a comparison of actual grams removed to the pathology report or operative note.

(R. 35.)

The Plaintiff underwent surgery on September 20, 2003. The surgery report indicated that 561 grams of tissue were removed from the Plaintiff's right breast, and 592 grams of tissue were removed from her left breast.

### 4.     *The Defendant's Refusal to Cover the Mammoplasty*

The Defendant refused to pay for the Plaintiff's surgery. The Plaintiff filed a grievance in

8

November 2003, and the Defendant responded in December. The Defendant stated that the

Plaintiff's mammoplasty was not covered because the amount of tissue removed from each

breast was less than the amount of tissue the criteria table listed as required to make the surgery

medically necessary.

The Plaintiff filed a formal appeal with the Defendant. After reviewing the evidence

submitted by the Plaintiff, the Defendant denied the Plaintiff's appeal for the same reason as

before: the amount of tissue removed did not meet the requirements of the criteria table to make

the mammoplasty medically necessary.

The Plaintiff requested an external appeal in August 2004. The Defendant requested

independent medical reviewer, Permedion, to review the decision to deny the Plaintiff's claim

for benefits. Permedion agreed with the Defendant. It stated that "Due to the small volume to be

resected, medical necessity for the breast can not be established." (R. 3.) The report discussed

the Schnur table and that the Plaintiff was below the 22nd percentile of the Schnur table,

suggesting the patient's motivation was not purely medical. The review quoted the Schnur article

when discussing the Plaintiff's failure to pursue remedies other than surgery:

> For reductions falling between the 5th and 22nd percentiles Schnur states that "if there is back pain, neck pain, and grooves in the shoulders and the patient has seen other doctors and has unsuccessfully tried pain medicine, physical therapy, chiropractic treatment and special bras, the patient should be covered." The records do not document that this patient has tried physical therapy, chiropractic treatment, and special bras.

(R. 4–5.) The report concluded that "based on the Schnur table the breast reduction was not

medically necessary for this enrollee." (R. 5.)

The Permedion review also cited other factors as suggesting the Plaintiff's reduction

mammoplasty was not medically necessary. The review stated that the Plaintiff had comorbid

9

conditions and that patients having comorbid contitions do not benefit from reduction

mammoplasty as much as other patients. In support of this opinion, the reviewer quoted a paper:

> The best paper on this topic is by Collins and Kerrigan
>
> (1).     The following is quoted directly from this article:
>          Breast hypertrophy has a significant impact on women's health status and quality
>          of life . . . . In women presenting for surgery, nonsurgical measures including
>          weight loss, physical therapy, special brassieres, and medications were not
>          effective in providing permanent relief of breast-related symptoms. In contrast,
>          both pain and overall health status were markedly improved by breast reduction,
>          essentially restoring functional status to that of aged-matched norms. . . . Among
>          women with symptomatic breast hypertrophy, body weight, bra cup size, and
>          weight of resection had no significant effect on the demonstrated benefits of
>          breast reduction. In other words, those with higher body mass index, smaller bra
>          cup sizes, or lower weight of breast tissue resected had as much improvement as
>          lower body mass index, larger breasted women, or those with more breast tissue
>          removed. Only increasing numbers of comorbid conditions were found to be
>          significantly associated with outcome, with a greater number of comorbidities
>          having a negative impact.

(R. 4.) The review stated that the Plaintiff had symptoms of macromastia, but that "she also has a

history of chronic pain, shoulder capsulitis, and low back pain which are confounding

conditions." (R. 3.) The review noted a letter written by the Plaintiff's rheumatologist in January

2004, indicating that the Plaintiff's migratory arthralgias and myalgias have been progressively

worsening, and that she may have fibromyalgia. (R. 4.) The review stated that the Plaintiff

"would seem to fall into the category noted above of a patient with comorbid conditions who did

not benefit from breast reduction to the degree expected." (R. 4.) The Permedion review also

noted that the Plaintiff was ordered to take physical therapy to address her low back pain and

shoulder capsulitis, but that she attended only one session.


*5.*     *The Plaintiff's Evidence in the Record*

The Plaintiff submitted evidence suggesting her mammoplasty was medically necessary

and lessened her symptoms. Dr. Lee wrote a letter to the Defendant requesting preauthorization for the reductive mammoplasty in May 2003, stating the Plaintiff had symptoms making mammoplasty medically necessary. (R. 91.) The Defendant pre-approved the mammoplasty. (R. 35.)

After the Defendant denied coverage, Dr. Lee wrote to the Defendant on November 17, 2003, stating he estimated that he would remove 800 grams of tissue, but removed less than that. He wrote that it is difficult to make accurate pre-surgery estimates because "[t]issue deep within the breast is quite variable in its consistency as well as its weight." (R. 95.) He suggested that the amount of tissue he removed was sufficient under the Schnur article to be considered reconstructive. He also asserted that "the patient's symptoms have been greatly helped, which was the whole medical indication for this procedure." (R. 95.)

Dr. Lee wrote another letter in December 2003, to the Defendant. (R. 492.) In this letter, he argued that the Plaintiff's mammoplasty did not meet the definition of cosmetic procedures used by the plan—"procedures that improve physical appearance but do not correct or materially improve a physical function"—because the breast reduction "did improve a physical function and this was performed for this reason." (R. 492.) He also stated that the procedure fit all the criteria listed in the plan's definition of "medically necessary." He again said that the Plaintiff's pain has lessened because of her surgery.

The Plaintiff stated in an affidavit that she had chronic back, neck, and shoulder pain. She took medications, participated in physical therapy, and engaged in a weight loss program, but they were not successful. In 2003, after being pre-approved for reduction mammoplasty by the Defendant, Dr. Lee performed the surgery on her. After the surgery, the Plaintiff stated she

experienced immediate relief of the chronic neck, back, and shoulder pain. Over a month later, she learned that the surgery would not be covered because Dr. Lee did not remove as much tissue as he initially estimated. She stated that Dr. Lee told her he decided to remove less tissue as originally estimated to avoid physically disfiguring the Plaintiff. (R. 698–700.)

**C.     Whether the Defendant's Decision is Examined under the De Novo Standard or the Arbitrary and Capricious Standard**

The Plaintiff sued the Defendant in September 2005, under 29 U.S.C. § 1132(a)(1)(B), to recover the benefits she claims the Defendant owes to her under the terms of the plan.

The Supreme Court held in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), that "a denial of benefits challenged under [29 U.S.C. § 1132(a)(1)(B)] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* If the plan gives discretion, the standard of review is the deferential arbitrary and capricious standard. *Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund.*, 390 F.3d 1040, 1045 (7th Cir. 2004).

The Plaintiff argues that the benefit plan did not give the administrator discretion to determine eligibility for benefits or to construe the terms of the plan, and so the Defendant's decision not to cover the Plaintiff's procedure is reviewed under the de novo standard. The Defendant disagrees, arguing that the plan clearly gives the plan administrator discretion to interpret the terms of the plan and determine eligibility for benefits.

There are no "magic words" required in a plan to entitle a coverage decision to review under the arbitrary and capricious standard. *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331

12

(7th Cir. 2000) ("[T]he courts have consistently held that there are no 'magic words' determining the scope of judicial review of decisions to deny benefits."). However, for a decision to be reviewed under the arbitrary and capricious standard, the plan's language must give clear notice that the administrator's determination is discretionary, that is, that benefits are paid only if the "plan administrator decides in his discretion that the applicant is entitled to them." *Id.* at 331. It is not enough for the plan to state that the administrator makes the determination; the plan must make clear that the administrator's decision is discretionary, or that the administrator's decision is not constrained by any pre-set standards. *Id.* at 332 (holding that the arbitrary and capricious standard applies only if the plan gives the employee "adequate notice that the plan administrator is to make a judgment largely insulated from judicial review by reason of being discretionary"); *Diaz v. Prudential Ins. Co. Am.*, 424 F.3d 635, 639–40 (7th Cir. 2005) ("[T]he critical question is whether the plan gives the employee adequate notice that the plan administrator is to make a judgment within the confines of pre-set standards, or if it has the latitude to shape the application, interpretation, and content of the rules in each case.")

The plan states, "PHP has sole and exclusive discretion to determine claims for benefits Covered under the Contract, including: making the initial claims decisions; resolving appeals of those decisions pursuant to our Grievance Procedures; and communicating those decisions to the affected Members." (R. 234–35.) The plan further states that "We reserve the right, in Our sole discretion, to: (1) change, modify, withdraw, or add benefits." (R. 235.) It also states that "The fact that We may have interpreted a provision of the Contract in a way that provides benefits shall not prevent Us from later interpreting the same provision in a way that does not provide benefits, subject to compliance with ERISA and other applicable law." (R. 235.) The plan says

13

that "the fact that We [cover health services that would not otherwise be covered] shall not in any way be deemed to require Us to do so in similar cases." (R. 235.) Finally, the plan states in its definition of "Medically Necessary" that "We retain the right to make all final determinations as to which Health Services are Medically Necessary, subject to the procedures specified in Article 5."[1] (R. 248.)

The plan language is sufficient to meet the minimum clarity required to give notice to employees that the administrator's determination is discretionary. The plan states that the administrator has "sole and exclusive discretion" in making claims decisions, and states that the decision—including both the initial claim decision and the decision on any appeal—is within the administrator's discretion, and is exclusive to the administrator. The other terms of the plan make clear that the administrator's decision is subject to few constraints: the administrator can change his interpretation of the contract, can modify the benefits given, and refuse to cover health services it has covered in the past.

The Plaintiff argues that the language stating the administrator has "sole and exclusive discretion to determine claims for benefits Covered under contract" means only that the administrator may determine whether an employee has submitted a claim for benefits. According to the Plaintiff, the administrator does not have discretion to determine whether the employee is entitled or qualified to receive benefits. The Plaintiff's interpretation of the plan's language is unserious. The plan says the Defendant has sole discretion to "determine claims for benefits covered under contract." A reasonable person would understand this to mean that when an employee submits a claim for a health service under the contract, the Defendant determines

---

[1]Article 5 outlines the grievance procedures, which include a review by an independent review organization. (R. 265.)

whether to give the benefit. The context supports this understanding by stating the Defendant has discretion to make the initial claim decision and resolve the administrative appeals. No reasonable person reading the plan would think the Defendant only has discretion to determine whether somebody has submitted a claim, as argued by the Plaintiff.

The Plaintiff also argues that the definition of medically necessary does not refer to the administrator having discretion to determine what services are medically necessary. Alone, the statement that "We retain the right to make all final determinations as to which Health Services are Medically Necessary," might be insufficient to give notice that the administrator's claims decisions are discretionary. However, this statement, in connection with the other statements in the plan, makes it clear that the decision to consider something as medically necessary under the contract is part of the administrator's discretionary decisionmaking.

**D.       Arbitrary and Capricious Standard**

Under the arbitrary and capricious standard, an "administrator's decision will only be overturned if it is 'downright unreasonable.'" *Tegtmeier*, 390 F.3d at 1045 (quoting *Carr v. Gates Health Care Plan*, 195 F.3d 292, 295 (7th Cir. 1999)). The court upholds the plan's decision if "(1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001). "It is not our function to decide whether we would reach the same conclusion as the Plan or even rely on the same authority." *Carr*, 195 F.3d at 294. "If the trustee makes an informed judgment and articulates an explanation for it that is

satisfactory in light of the relevant facts, i.e., one that makes a 'rational connection' between the issue to be decided, the evidence in the case, the text under consideration, and the conclusion reached, then the trustee's decision is final." *Exbom v. Central States, Se. and Sw. Areas Health and Welfare Fund*, 900 F.2d 1138, 1143 (7th Cir. 1990).

Where, as here, there is no allegation that the application was not given a genuine evaluation, and review under ERISA is deferential, "judicial review is limited to the evidence that was submitted in support of the application for benefits, and the mental processes of the plan's administrator are not legitimate grounds of inquiry any more than they would be if the decisionmaker were an administrative agency." *Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 982 (7th Cir. 1999).

"Although the parties' cross motions are for summary judgment, actually before the court is administrative review of the benefits decisions with the administrative records being the essential uncontested fact." *Bails v. Blue Cross/Blue Shield of Ill.*, 438 F. Supp. 2d 914 (N.D. Ill. 2006). Evidence not contained in the administrative record is only appropriate to consider if it is relevant to procedural issues, in which case the standard summary judgment rules would apply. *Ralston v. Suiza Dairy Group, L.P.*, 2006 WL 2917343, *10 (N.D. Ind. Oct. 10, 2006); *Dubois v. Paul Revere Life Ins. Co.*, 2004 WL 2554449, *2 (N.D. Ill. Nov. 9, 2004).

E.     Analysis

The Plaintiff argues that the evidence shows her mammoplasty met the requirements of the plan for coverage. The Defendant argues that it only covers mammoplasties in which the amount of tissue removed meets the requirements set out in its guidelines, and that the Plaintiff

16

did not have enough tissue removed to be covered. The Defendant's guideline requirements concerning the amount of tissue that must be removed for the procedure to be considered non-cosmetic are derived from an article authored by Paul Schnur and others. The Defendant concedes that the fact that the amount of tissue removed was less than what was required by its guidelines was the sole basis for the denial of the Plaintiff's benefits. (Def. Supp. Br. 4, DE 31.) Ultimately, the Defendant cannot square its use of the Schnur article and its mammoplasty guidelines with the language in the plan, and the Plaintiff's motion for summary judgment must be granted.

The problem for the Defendant is that the language of the plan, which sets forth the Defendant's duties and obligations, defines the cosmetic surgery exclusion differently than the plan guidelines do. The plan defines as cosmetic "procedures that improve physical appearance *but do not correct or materially improve a physical function*." (R. 242 (emphasis added).) This definition does not make a patient's motivation for a procedure relevant; it looks to whether the procedure materially improves a physical function. For a procedure to be deemed cosmetic within this definition, there would have to be some evidence that the procedure did not correct or materially improve a physical function.

The guidelines define cosmetic procedure as "surgery performed primarily for cosmetic reasons, with the intention to enhance or change physical appearance." (R. 173.) This definition looks only to the patient's intent in undergoing surgery, without regard for whether it improves a physical function. In order to set an objective basis to determine whether a surgery is performed with the intent to improve appearance, the guideline employs a formula derived from the Schnur article. Taking into account a patient's height and weight, the guidelines cover only those mammoplasties that the Schnur article predicted would be motivated purely by medical reasons

17

(those above the 22nd percentile in Figure One, *supra* p. 7). In this, the guideline is entirely consistent; it defines cosmetic surgery as a surgery motivated by cosmetic concerns, and uses the findings of a study to determine when a surgery is likely have been motivated by cosmetic concerns.

The Plaintiff does not question the merits of the Schnur paper, and the Court has no reason to doubt its findings. The Court agrees that based on the Schnur table, the Plaintiff's motive in undergoing the procedure was partially to improve appearance. What is in dispute is whether this motivation is relevant to determining whether a procedure is cosmetic within the definition of the plan. The plain language of the plan does not exclude coverage for patients undergoing procedures with the motivation to improve appearance; the plan excludes coverage for procedures that do not materially improve a physical function. The Schnur paper has nothing to say about the circumstances in which reduction mammoplasty will improve a physical function. The Schnur table addresses only the likely motivations of patients undergoing reduction mammoplasty.

The plan excludes procedures that are not medically necessary, but the definition of "medically necessary" does not make the patient's motivations in seeking a procedure relevant. The Court sees nothing in the definition of medically necessary, or in any other part of the plan, that would bar coverage for a procedure that materially improves a physical function, but was undergone for the purpose of improving appearance.

Where "fiduciaries or administrators of an ERISA plan controvert the plain meaning of a plan, their actions are arbitrary and capricious." *Swaback v. Am. Info. Techs. Corp.*, 103 F.3d 535, 540 n.9 (7th Cir. 1996) (citing cases). In *Egert v. Conn. Gen. Life Ins. Co.*, 900 F.2d 1032, 1036–38 (7th Cir. 1990), the Seventh Circuit held that it was arbitrary and capricious to follow

18

plan guidelines and refuse coverage when the guidelines contradicted the clear language of the plan. The guidelines in that case instructed that all claims for in-vitro fertilization were to be denied. The court found that those guidelines contradicted language in the plan that required coverage for services essential to the treatment of an injury. Reliance on the guidelines to deny coverage for in-vitro fertilization was therefore arbitrary and capricious. *Id.*

In this case, as in *Egert*, the plan guidelines are inconsistent with the terms of the plan. The plan excludes as cosmetic only those procedures that do not materially improve a physical condition. The mammoplasty guidelines exclude procedures that improve a physical condition when the motivation, judged by reference to the Schnur table, is to improve appearance. Because of this contradiction, reliance on the guidelines is arbitrary and capricious

The Defendant claims that because the guidelines present an objective basis for determining whether a mammoplasty will be considered cosmetic or non-cosmetic, reliance on the guidelines cannot be arbitrary or capricious. However, the simple fact that objective criteria is used does not matter if the objective criteria is not rationally connected to the language in the plan. Denying claims filed on Thursdays is an objective method of determining claims, but it would be arbitrary and capricious.

The Defendant states in a footnote that "[a]lthough the Schnur study discusses motivation, Schnur and his colleagues established objective criteria to indicate when a procedure was medically necessary without regard for a patient's motivation." (Def. Supp. Br. 2 n.1, DE 31.) This is incorrect. The Schnur article established objective criteria to determine from the amount of tissue removed and a patient's height and weight whether the patient likely had health or cosmetic purposes in undergoing reduction mammoplasty. The objective criteria could be used by a third-party payer as a substitute to examining each individual patient's motives. But it

is wrong to suggest that the Schnur article was unconcerned with a patient's motivations. As the article states: "This study attempts to add information to help answer the motivation question for reduction mammaplasty." (Schnur 234, R. 76.) The article is only concerned with determining what a patient's motivations are for undergoing reductive mammoplasty. There is nothing in the article discussing the extent to which reduction mammoplasty materially improves a physical function.

To be clear, the Court has no opinion as to the reliability of the Schnur paper. The Court is only recognizing that there is no rational connection between the mammoplasty guideline's focus on a patient's motivation in seeking surgery and the plan's definition of "cosmetic procedure." If the plan had defined "cosmetic procedure" in the same way as the guidelines, reliance on the guidelines to exclude the Plaintiff's mammoplasty as cosmetic would likely be reasonable. However, the plan definition of cosmetic is different than the guideline definition.

Using the definition of "cosmetic procedure" in the plan, the Defendant cannot deem a procedure cosmetic and therefore excluded without any evidence that the procedure did not materially improve a physical function. The Defendant's coverage decision was based entirely on the Schnur article as applied by its guideline. The Schnur article has nothing to say about the circumstances in which a reduction mammoplasty improves a physical function. The only evidence in the record on that question suggests the Plaintiff's mammoplasty did materially improve a physical function. She says it did and her doctor says it did. In fact, the Defendant's independent review cited a medical paper stating that the amount of tissue removed is generally not a factor in whether reduction mammoplasty improves pain and overall health:

> both pain and overall health status were markedly improved by breast reduction, essentially restoring functional status to that of age-matched norms. . . . [T]hose with higher body mass index, smaller bra cup sizes, or lower weight of breast tissue resected

> had as much improvement as lower body mass index, larger breasted women, or those
> with more breast tissue removed. Only increasing numbers of comorbid conditions were
> found to be significantly associated with outcome, with a greater number of
> comorbidities having a negative impact.

(Permedion Review 3, R. 4.) The reviewer suggested that the Plaintiff "did not benefit from

breast reduction to the degree expected," but did not find that she had no material improvement

of a physical function. He went on to ultimately conclude that, based on the Schnur article, her

procedure was not medically necessary. As stated above, under the language of the plan, the

Defendant must have some evidence that a procedure did not materially improve a physical

function to deem a procedure cosmetic. The Court sees no such evidence in the record, and so,

the Defendant's decision was not rationally connected to the plan language or the evidence

before it. In other words, its decision was arbitrary and capricious.


## ORDER

For these reasons, the Plaintiff's motion for summary judgment is GRANTED, and the

Defendant's motion for summary judgment is DENIED. Judgment is to be entered for the

Plaintiff.

SO ORDERED on July 3, 2007.

_____/s/ Theresa L. Springmann_____
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
